UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| QED PRODUCTIONS, LLC, et al., | ) | CV 07-0225 SVW (SSx) |
| | ) | |
| | ) | ORDER DENYING PLAINTIFFS' |
| Plaintiffs, | ) | MOTION FOR PARTIAL SUMMARY |
| | ) | JUDGMENT AS TO STANDING [95, |
| | ) | 108, 121] |
| v. | ) | |
| | ) | |
| JAMES NESFIELD, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## I.  INTRODUCTION

Plaintiffs Stan Lee, QED Productions, LLC ("QED"), and POW! Entertainment, Inc. ("POW!") claim that they have interests in the copyrights and trademarks at issue sufficient to confer standing on Plaintiffs to bring this suit.[1]  However, because the purported transfer

---

[1] The intellectual property rights at issue here are copyrights in entertainment projects known as The Accuser, Stan's Evil Clone (Evil Clone), and The Drifter.  (SAC, at 40-41.)  The trademarks at issue in this case are "Stan Lee Presents," "Excelsior!," "The Accuser (and Accuser)," "The Drifter," "Stan Lee Media," "Stan Lee," and "Stan Lee

of the Properties from the chapter 11 bankruptcy estate of Stan Lee Media, Inc. ("SLMI") was not authorized by the bankruptcy court, any such transfer was void as a matter of law.  Thus, Plaintiffs QED and POW! cannot assert an interest in the Properties on this basis.

   Plaintiffs, however, assert an ownership interest in the Properties on a separate basis.  Stan Lee claims that the Properties never entered bankruptcy because he allegedly terminated his employment agreement with SLMI before bankruptcy or, alternatively, that the employment agreement was void under California law.  Thus, Plaintiffs contend that they have an interest in the Properties that is not dependent on the transfer from the bankruptcy estate.

**II.  FACTS**

   Plaintiff Stan Lee is a renowned comic book writer and creator of a number of established comic book heroes, such as Spider-Man, X-Men, and The Fantastic Four.  This dispute dates back to October 13, 1998, when Stan Lee and his associate Peter Paul incorporated Stan Lee Entertainment, Inc., a Delaware corporation ("SLE").  (Second Am. Compl. ("SAC"), at 15.)  In April 1999, SLE merged with a Delaware corporation named Stan Lee Media, Inc. ("SLMI-DE"), the resulting company being named SLMI-DE.  (Id.)  SLMI-DE then entered into a transaction with a Colorado corporation named Stan Lee Media, Inc. ("SLMI-CO"), which resulted in SLMI-DE becoming a wholly-owned

---

   (signature)."  (Id. at 14-15.)  The domain names involved are "www.stanleemedia.net" and "www.stanleestudios.com."  (Id. at 47-49.)  These intellectual properties are hereinafter referred to as the "Properties."

2

subsidiary of SLMI-CO. (Id. at 15-16.) Both SLMI-CO and SLMI-DE are named as Defendants in this action.[2]

On October 15, 1998, Stan Lee entered into a agreement with SLE, which was titled "Employment Agreement/Rights Assignment." (Pls.' Ex. 9 ("Employment Agreement"), at 1.) The Employment Agreement provided that Stan Lee would serve as Chairman and Creative Officer of SLE for life, in return for a salary, stock options, and other employment compensation. (Id.) Furthermore, Stan Lee agreed to "assign, convey and grant to [SLE] forever, all right, title and interest I may have or control, now or in the future" in copyrights and trademarks.[3] (Id. at 4.)

On February 12, 2001, both SLMI-CO and SLMI-DE (collectively "Debtors") filed for chapter 11 bankruptcy in the United States Bankruptcy Court for the Central District of California. (See Pls.' Ex. 1.) Just days before the bankruptcy filing, however, Stan Lee wrote to Ken Williams, President of SLMI informing him that Stan Lee considered SLMI to be in material breach of the October 15, 1998 Employment Agreement. (See Pls.' Ex. 10.) Stan Lee claimed that the Employment Agreement had been "terminated" and claimed "rights and ownership in the Properties" including trademarks and copyrights. (Id.)

---

[2] At certain points in this Order, the Court refers to both SLMI-CO and SLMI-DE as "SLMI." This is because both companies entered bankruptcy together, and at certain points in the record the parties do not make a distinction between the two. The Court makes a distinction between the two whenever legally relevant.

[3] Although the Court does not decide the issue at this time, the parties appear do not dispute that the Employment Agreement remained binding on Stan Lee and SLMI, as SLE's successor in interest.

In bankruptcy, the parties in interest negotiated a deal in order to capitalize on the Debtors' intellectual property rights. This resulted in the bankruptcy court approving the sale of the properties to a company called SLC, LLC, a California corporation ("SLC"). In their Motion for Order to Approve Sale of Assets Free and Clear of Liens, the Debtors noted a potential dispute regarding whether the Employment Agreement was terminated prior to bankruptcy, but noted that any litigation would "likely . . . be time consuming, expensive and may result in 'bad blood' which will jeopardize future exploitation of the Creative Assets." (Pls.' Ex. 3, at 3.) Thus, in order to maximize the return to all parties in interest, they agreed to have the properties sold to "an entity creatively controlled by Stan Lee." (Id.)

On April 11, 2002, the bankruptcy court issued an order approving the sale of assets to SLC, LLC ("Sale Approval Order"). (Pls.' Ex. 5.) The Sale Approval Order incorporated by reference the Asset Purchase Agreement ("APA") dated November 19, 2001. (Id. at 2.) The APA was entered into by Debtors and "SLC, LLC, a California limited liability company to be formed and controlled by Stan Lee."[4] (Pls.' Ex. 6, at 1.) The APA provided a mechanism whereby the Debtors' creditors would be paid back in full through the exploitation by Stan Lee and SLC of the assets. (See id. at 4-5.) Stan Lee explicitly represented in the APA that the purchaser was "a duly formed limited liability company

---

[4] The APA purportedly transferred the rights in (1) the Stanlee.NET web site and portal; (2) The Accuser; (3) The Drifter; (4) Stan's Evil Clone; (5) the Backstreet Project; (6) Gene Roddenberry's Starship; (7) Mary J. Blige; (8) X-Treme Heroes; (9) Police Force 2220; (10) Chrysallis; (11) The Stone Giant; (12) Stan Junior; (13) interest in a joint venture call the Lee Schultz Partnership; (14) DC Comics; (15) Toon Boom; (16) Cyberworld; (17) Mobius; and (18) Hollywood Christmas Parade.

organized under the laws of California." Stan Lee signed the APA on behalf of SLC. (Id. at 6.) The bankruptcy case was finally dismissed on December 6, 2006.

The properties were never transferred to SLC, however, because SLC was never actually formed. Rather, Plaintiffs claim that the properties were transferred to QED, a Delaware limited liability company wholly owned and controlled by Stan Lee. (SAC, at 28.) Stan Lee contends that he transferred the assets to QED rather than to SLC because Stan Lee did not want his name associated with the new company that was going to exploit the assets. (Id. at 27.)

In November 2006, Plaintiffs assert that Defendants Nesfield, Galloway, and Cogan attempted to revive SLMI-CO. (Id. at 29.) These three defendants allegedly conducted a special shareholders meeting and were elected the controlling officers of SLMI-CO. (Id.) They then allegedly began using the Properties and allegedly violated Plaintiffs' asserted copyrights and trademarks. (Id.)

Plaintiffs Stan Lee, QED, and POW! initiated this action on January 9, 2007. Plaintiffs filed a First Amended Complaint on April 16, 2007. (See Docket No. 13.) In an Order issued February 19, 2008, the Court ruled that Defendants Nesfield, Galloway, and Cogan did not properly revive SLMI-CO under Colorado corporate law and, therefore, had not right to use any of SLMI's assets. (See Docket No. 63, at 12.) Thereafter, on August 25, 2008, Plaintiffs filed a Second Amended Complaint. (Docket No. 79.)

The SAC alleges claims arising under federal law for (1) copyright infringement; (2) trademark infringement pursuant to 15 U.S.C. § 1125(a); (3) trademark infringement pursuant to 15 U.S.C. § 1114; (4)

trademark dilution, 15 U.S.C. § 1125(c); (5) cybersquatting, 15 U.S.C. § 1125(d); and (6) declaratory relief, 28 U.S.C. § 2201. (SAC, at 38-50.) Plaintiffs also allege nine other state law claims. With regard to copyright infringement, Plaintiffs allege that they are the owners of The Accuser, Stan's Evil Clone, and The Drifter, and that Defendants used, or aided and abetted the others to use, these properties without Plaintiffs' authorization. (Id. at 38.) With regard to the federal trademark claims, Plaintiffs allege that Defendants unauthorizedly used the terms "Stan Lee Presents," "Excelsior!," "The Accuser (and Accuser)," "The Drifter," "Stan Lee Media," "Stan Lee," and "Stan Lee (signature)." (Id. at 41-47.) With regard to the claim for cybersquatting, Plaintiffs allege that Defendants registered and used the domain names "www.stanleemedia.net" and "www.stanleestudios.com," without prior authorization.[5] (Id. at 47.)

On November 5, 2008, the Court held a status conference in this matter at which time the Court ordered Plaintiffs to file a new Motion for Summary Judgment in order to resolve the issue of who owns the properties at issue here.

///
///
///
///
///

---

[5] In the SAC, Plaintiffs added the individual defendants Peter Blumen, Christopher Belland, Peter F. Paul, and John Petrovitz. The allegations regarding these four defendants are primarily based on aiding and abetting the other alleged violations. (SAC, at 68-70.)

**III. ANALYSIS**

    **A. Legal Standard**

Rule 56(c) requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Tarin v. County of Los Angeles, 123 F.3d 1259, 1263 (9th Cir. 1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex Corp v. Catrett, 477 U.S. 317, 323-24 (1986). That burden may be met by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id. at 325. Once the moving party has met its initial burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify specific facts that show a genuine issue for trial. See id. at 323-34; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1968). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." Addisu v. Fred Meyer, 198 F.3d 1130, 1134 (9th Cir. 2000). Only genuine disputes – where the evidence is such that a reasonable jury could return a verdict for the nonmoving party – over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. See Anderson, 477 U.S. at 248; Aprin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir.

2001) (the nonmoving party must identify specific evidence from which a reasonable jury could return a verdict in its favor).

**B.  Ownership of the Properties**

The issue before the Court is what interests, if any, Plaintiffs have in the copyrights and trademarks at issue, and whether those interests are sufficient to afford Plaintiffs standing to bring the claims alleged.  Standing of course is a threshold requirement for any case brought in federal court.  See Clark v. City of Lakewood, 259 F.3d 996, 1006 (9th Cir. 2001) (noting that the requirements for standing are an injury in fact traceable to the conduct of the defendant, and the possibility that the injury will be redressed by a favorable decision).  However, where as here, "the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await determination of the relevant facts on either a motion going to the merits or at trial." Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983); see also Data Disc, Inc. v. Systems Tech. Assocs., Inc., 557 F.2d 1280, 1285 n.2 (9th Cir. 1977).

Under any of Plaintiffs' theories of relief, Plaintiffs must have some legitimate interest in the Properties at issue.  For example, federal copyright law limits the right to bring suit to the "legal or beneficial owner of an exclusive right under a copyright."  17 U.S.C. § 501(b); see also Cavalier v. Random House, Inc., 297 F.3d 815, 822 (9th Cir. 2002).  Thus, copyright law requires the plaintiff to be the owner

or an exclusive licensee.  See Campbell v. Board of Trustees, 817 F.2d 499, 504 (9th Cir. 1987).  Plaintiffs' claims for trademark infringement similarly require the plaintiff to have at least some discernible interest in the mark.  See, e.g., 15 U.S.C. § 1125(a); 15 U.S.C. § 1125(d) ("A person shall be liable in a civil action *by the owner* of a mark . . . ." (emphasis added)); 15 U.S.C. § 1125(c)(1) (indicating that the plaintiff must be the "owner of a famous mark that is distinctive."); Waits v. Frito Lay, Inc., 978 F.2d 1093, 1109 (9th Cir. 1992) (holding that standing pursuant to 15 U.S.C. § 1125(a) exists if a party has a commercial interest in a product wrongfully identified with another's mark, or in the misused mark); Shonac Corp. v. AMKO Intern., Inc., 763 F. Supp. 919, 929 (S.D. Ohio 1991) (holding that the plaintiff must have "some discernible interest in the mark").

Accordingly, the Court must determine whether Plaintiffs have rights in the subject properties sufficient to confer standing.

### 1. Transfer from Bankruptcy Estate

As an initial matter, the Court finds no merit to Plaintiffs' claim that they acquired rights in the Properties from the transfer of the assets from the bankruptcy estate.  In the April 12, 2002 Sale Approval Order, the bankruptcy court approved the sale of certain assets from the estate of the debtors, SLMI-CO and SLMI-DE, to a third party named SLC, LLC.  However, that transfer never took place.  Rather, Plaintiffs contend that the assets were validly transferred to Plaintiff QED.

This argument is entirely without merit because any such transfer performed was in violation of the automatic stay and, therefore, void as a matter of law.  The Ninth Circuit has made clear that "violations of the automatic stay are void, not voidable."  Schwartz v. United States, 954 F.2d 569, 571 (9th Cir. 1992).  As a result, any purported sale or transfer of assets belonging to the bankruptcy estate has no effect.  Id. at 572; see also 40235 Washington Street Corp. v. Lusardi, 329 F.3d 1076, 1080 (9th Cir. 2003) (finding a tax sale conducted to enforce a tax lien on real property was void because it was in violation of the automatic stay and not approved by the bankruptcy court).  Here, the bankruptcy judge approved the sale of the assets to SLC, LLC, but never approved such sale to QED.  (See Pls.' Exs. 5, 6.)  Thus, any transfer of the assets to QED, or to any other entity for that matter, was void and had not effect.  See Lusardi, 329 F.3d at 1080.

Plaintiffs argue that there was no material difference between SLC and QED, and that Plaintiffs substantially complied with the Sale Approval Order, because the only important fact was that the company to which the assets were transferred was controlled by Stan Lee.  This argument fails, however, because there are other material differences between SLC and QED.  First, Stan Lee represented to the bankruptcy court that SLC was a corporation registered under the laws of the state of California. (See Pls.' Ex. 6, at 6.)  However, QED is incorporated under the laws of the state of Delaware. (See SAC, at 1.)  This is not a difference in name only; QED was an entirely different corporation operating under different state laws of incorporation.

Second, an essential aspect of the APA approved by the bankruptcy court was the fact that SLC, as controlled by Stan Lee, would make payments to SLMI's creditors until the creditors were paid in full. (See Pls.'s Ex. 6, at 4-5.)  As an entirely different entity, QED would likely not be bound by the terms of the APA, and QED would essentially be relieved from the obligation to pay back the creditors.  Indeed, there is no evidence in the record that QED has performed under the APA to make payments to SLMI's creditors.[1]

Moreover, QED was formed in November of 2001, before the motion for approval of the transfer of assets was filed with the bankruptcy court.  (See Pls.' Ex. 8.)  QED's stated purpose was to exploit the assets transferred from SLMI's bankruptcy.  (See Pls.' Ex. 18.)  Plaintiffs do not explain why, if they simply decided to use a different name, they did not changed the name on the APA before it was submitted to the bankruptcy court for approval.

Plaintiffs also assert that if Defendants take umbrage to the sale of assets to QED allegedly in violation of the Agreement, they must bring the action in front of the Bankruptcy Court.  Plaintiffs view any argument concerning the validity of the transfer as a collateral attack on the bankruptcy court's April 11, 2001 Order.  Plaintiffs, however, misconstrue the nature of Defendants' actions in this case.  Defendants are not asserting, as a collateral matter, that the bankruptcy court's Sale Approval Order is void and cannot be enforced.  Indeed, under such circumstances the prudent course of action would be to return to the

---

[1] The only evidence that Plaintiffs have offered in this regard are declarations from Junko Kobayashi and Gill Champion stating that they paid approximately $7,500.00 to SLMI.  There is no evidence, however, that any amount was paid to SLMI's *creditors*.

11

bankruptcy court and nullify the sale order. Instead, Defendants argue that Plaintiff QED was never granted rights in the intellectual property as a result of the sale order and, accordingly, there is no basis for its claims in the present action. Defendants make use of the Sale Approval Order only insomuch as it establishes that Plaintiff QED is not the rightful owner of the properties at dispute. Accordingly, the Court finds that Defendants' actions in this case do not constitute an improper collateral attack.

### 2. Plaintiffs' Other Ownership Theory

Plaintiffs assert that they obtained rights in the Properties by virtue of the fact that the Properties were never property of the bankruptcy estate. Plaintiffs assert two alternate bases for this theory. First, Plaintiffs claim that Stan Lee's Employment Agreement was unenforceable or void because it was an agreement for personal services for a term in excess of that allowed under California Labor Code § 2855. (See Pls.' Mot., at 4.) Secondly, Plaintiffs argue that Stan Lee properly terminated the Employment Agreement by letter on January 30, 2001, and that, therefore, Stan Lee's rights in the Properties automatically reverted back to him on that date. (See id., at 3-4.) Under either theory, Plaintiffs contend that the Properties were never property of the bankruptcy estate.[2]

---

[2] Plaintiffs may also have a sufficient interest in the trademarks at issue here because they may not have been involved in the sale of assets from the bankruptcy court. However, the rights in the trademarks may be affected by Stan Lee's apparent assignment of rights in the Employment Agreement. Thus, Plaintiffs' claims for trademark infringement may also depend on the outcome of the litigation surrounding the Employment Agreement.

It appears, however, that resolution of these issues will necessarily involve SLMI in the litigation. For example, if Stan Lee asserts his claim based on ownership of the properties due to Stan Lee's termination of the employment contract, this dispute will have to be litigated between Stan Lee and SLMI. At this time, however, SLMI does not have anyone to speak on its behalf. SLMI-CO is currently going through a procedure in the Colorado courts to elect a board of directors. Because any further litigation will necessarily depend on the result of that election, this case should be stayed and placed on the Court's inactive calendar pending the outcome of that proceeding. The companion case, <u>Stan Lee Media, Inc. v. Stan Lee, et al.</u>, CV 07-4438 SVW (SSx), is also stayed and placed on the Court's inactive calendar in the interim. Once SLMI has a representative who is authorized to speak on its behalf, the parties should notify this court and the cases will be returned to the active calendar so that these further issues can be resolved.

**D.  Motions to Withdraw as Counsel**

As indicated at the hearing, having received no opposition, O'Donnell & Associates' Motion to Withdraw as Counsel is GRANTED. (<u>See</u> Docket No. 95.) The Andersen Firm, P.C.'s Motion to Withdraw as Counsel is DENIED. The Andersen Firm is currently representing several of the individual defendants and SLMI in this action, and they have indicated their opposition to the Andersen Firm's withdrawal. The Andersen Firm may renew this request once SLMI has a elected a duly

authorized board of representatives, but any withdrawal by the Andersen Firm is not appropriate at this time.

## IV. CONCLUSION

The Court finds that Plaintiff QED did not acquire an interest in the Properties by virtue of a transfer from the bankruptcy court because any such transfer was done in violation of the automatic stay, and was therefore void as a matter of law. As factual issues potentially remain regarding whether Plaintiffs have interests in the Properties sufficient to confer standing, Plaintiffs' Motion for Partial Summary Judgment on the issue of standing is DENIED. With regard to Plaintiffs' alternative theory of ownership, these cases are STAYED pending the outcome of the proceedings in Colorado, which will result in Defendant SLMI-CO having a representative that is duly authorized to speak on its behalf. The parties are ordered to inform the Court, in writing, when the stay should be lifted.

IT IS SO ORDERED.

DATED: January 20, 2009

STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE